## McGINLEY v. CLEARY.

(Third Division. Fairbanks. August 8, 1904.)

No. 125.

1. CANCELLATION OF INSTRUMENTS—FRAUD—GAMING CONSIDERATION —INTOXICATION.

Equity will grant relief where the transfer of a valuable property has been fraudulently extorted, for a grossly inadequate consideration, from a person in such a state of intoxication as not to be in his right mind or capable of transacting any business. or entering into any contract.

[Ed. Note.—For cases in point, see vol. 8, Cent. Dig. Cancellation of Instruments, §§ 1, 6; vol. 10, Cent. Dig. Contracts, §§ 412, 414.]

2. GAMING—EQUITY—FRAUD.

Plaintiff was the proprietor of a saloon. He gambled with defendant therein with dice, and lost $1,800. To pay his loss he conveyed the premises in dispute. Upon a suit in equity to recover, held, that equity will not assist a gambler to recover losses at his own game.

[Ed. Note.—For cases in point, see vol. 24, Cent. Dig. Gaming,. §§ 26, 84.]

On the 29th of last November the plaintiff was, and for some time previous thereto had been, one of the proprietors of that

certain two-story log cabin described in the pleadings as the "Fairbanks Hotel," situate upon lot 1, Front street, in the town of Fairbanks, Alaska. The opening scene discovers him drunk, but engaged on his regular night shift as barkeeper in dispensing whisky by leave of this court on a territorial license to those of his customers who had not been able, through undesire or the benumbing influence of the liquor, to retire to their cabins. The defendant was his present customer. After a social evening session, the evidence is that at about 3 o'clock in the morning of the 30th they were mutually enjoying the hardships of Alaska by pouring into their respective interiors unnumbered four-bit drinks, recklessly expending undug pokes, and blowing in the next spring cleanup. While thus employed, between sticking tabs on the nail and catching their breath for the next glass, they began to tempt the fickle goddess of fortune by shaking plaintiff's dicebox. The defendant testifies that he had a $5 bill, that he laid it on the bar, and that it constituted the visible means of support to the game and transfer of property which followed. That defendant had a $5 bill so late in the evening may excite remark among his acquaintances.

Whether plaintiff and defendant then formed a mental design to gamble around the storm center of this bill is one of the matters in dispute in this case about which they do not agree. The proprietor is plaintively positive on his part that at that moment his brains were so benumbed by the fumes or the force of his own whisky that he was actually non compos mentis; that his mental faculties were so far paralyzed thereby that they utterly failed to register or record impressions. His customer, on the other hand, stoutly swears that the vigor and strength of his constitution enabled him to retain his memory, and he informed the court from the witness stand that while both were gazing at the bill, the proprietor produced his near-by dicebox, and they began to shake

for its temporary ownership. Neither the memory which failed nor that which labored in spite of its load enabled either the proprietor or the customer to recall that any other money or its equivalent came upon the board. The usual custom of $500 millionaires grown from wild cat bonanzas was followed, and as aces and sixes alternated or blurringly trooped athwart their vision, the silent upthrust of the index finger served to mark the balance of trade.

They were not alone. Tupper Thompson slept bibulously behind the oil tank stove. Whether his mental receiver was likewise so hardened by inebriation as to be incapable of catching impressions will never be certainly known to the court. He testified to a lingering remembrance of drinks which he enjoyed at this time upon the invitation of some one, and is authority for the statement that when he came to the proprietor was so drunk that he hung limply and vine-like to the bar, though he played dice with the defendant, and later signed a bill of sale of the premises in dispute, which Tupper witnessed. Tupper also testified that the defendant was drunk, but according to his standard of intoxication he was not so entirely paralyzed as the proprietor, since he could stand without holding to the bar. Not to be outdone either in memory or expert testimony, the defendant admitted that Tupper was present, that his resting place was behind the oil tank stove, where, defendant testifies, he remained on the puncheon floor in slumberous repose during the gaming festivities with the dicebox, and until called to drink and sign a bill of sale, both of which he did according to his own testimony. One O'Neil also saw the parties plaintiff and defendant about this hour in the saloon, with defendant's arm around plaintiff's neck in maudlin embrace.

After the dice-shaking had ceased, and the finger-tip bookkeeping had been reduced to round numbers, the defendant testifies that the plaintiff was found to be indebted to him in

the sum of $1,800. Whether these dice, which belonged to the bar and seem to have been in frequent use by the proprietor, were in the habit of playing such pranks on the house may well be doubted; nor is it shown that they, too, were loaded. It is just possible that mistakes may have occurred pending lapses of memory by which, in the absence of a lookout, the usual numbers thrown for the house were counted for the defendant, and this without any fault of the dice. However this may be, the defendant swears that he won the score, and passed up the tabs for payment.

According to the defendant's testimony, the proprietor was also playing a confidence game, whereupon, in the absence of money, the defendant suggested that he make him a bill of sale of the premises. Two were written out by defendant. The second was signed by plaintiff and witnessed by Tupper, and for a short time the defendant became a tenant in common with an unnamed person and an equitable owner of an interest in the saloon. The plaintiff testifies that during all this time, and until the final act of signing the deed in controversy, he was drunk, and suffering from a total loss of memory and intelligence. The evidence in support of intelligence is vague and unsatisfactory, and the court is unable to base any satisfactory conclusion upon it.

Above the mists of inebriety which befogged the mental landscape of the principals in this case at that time rise a few jagged peaks of fact which must guide the court notwithstanding their temporary intellectual eclipse. After the dice-throwing had ceased, the score calculated, and the bills of sale written, and the last one conveying a half interest in the premises signed by the plaintiff, he accompanied the defendant to the cabin of Commissioner Cowles, about a block away, on the banks of the frozen Chena, and requested that official to affix his official acknowledgment to the document. Owing to their hilarious condition and the early hour at which they so rudely

broke the judicial slumbers, the commissioner refused to do business with them, and thrust them from his chamber. He does not testify as to the status of their respective memories at that time, but he does say that their bodies were excessively drunk; that of the defendant being, according to the judicial eye, the most wobbly. He testifies that the plaintiff was able to and did assist the defendant away from his office without any official acknowledgment being made to the bill of sale. The evidence then discloses that, in the light of the early morning, both principals retired to their bunks to rest; witness Sullivan going so far as to swear that the plaintiff's boots were removed before he got in bed.

The question of consideration is deemed to be an important one in this case. Defendant asserts that it consisted of the $1,800 won at the proprietor's own game of dice, but Tupper Thompson relapses into sobriety long enough to declare that the real consideration promised on the part of the defendant was to give a half interest in his Cleary creek placer mines for the half interest in the saloon; that defendant said the plaintiff could go out and run the mines while he remained in the saloon and sold hootch to the sour-doughs, or words to that effect. Tupper's evidence lacks some of the earmarks; it is quite evident that he had a rock in his sluice box. The plaintiff, on the other hand, would not deny the gambling consideration; he forgot; it is much safer to forget, and it stands a better cross-examination.

The evidence discloses that about 3 or 4 o'clock p. m. on the evening of the 30th the defendant went to the apartment of the proprietor, and renewed his demand for payment or a transfer of the property in consideration of the gambling debt. After a meal and a shave they again appeared, about 5 o'clock, before the commissioner; this time at his public office in the justice's court. Here there was much halting and whispering. The bill of sale written by Cleary was presented to the pro-

2 A.R.—18

prietor, who refused to acknowledge it before the commissioner. The commissioner was then requested by Cleary to draw another document to carry out the purpose of their visit there. The reason given for refusing to acknowledge the document then before the commissioner was that it conveyed a half interest, whereas the plaintiff refused then to convey more than a quarter interest. The commissioner wrote the ducument now contained in the record, the plaintiff signed it; it was witnessed, acknowledged, filed for record, and recorded in the book of deeds, according to law.

The deed signed by McGinley purports to convey "an undivided one-fourth (¼) interest in the Fairbanks Hotel, situate on lot No. one (1) Front street, in the town of Fairbanks." The consideration mentioned is one dollar, but, in accordance with the finger-tip custom, it was not paid; the real consideration was the $1,800 so miraculously won by the defendant the previous night by shaking the box. Plaintiff soon after brought this suit to set aside the conveyance upon the ground of fraud (1) because he was so drunk at the time he signed the deed as to be unable to comprehend the nature of the contract, and (2) for want of consideration.

It is currently believed that the Lord cares for and protects idiots and drunken men. A court of equity is supposed to have equal and concurrent jurisdiction, and this case seems to be brought under both branches. Before touching upon the law of the case, however, it is proper to decide the questions of fact upon which these principles must rest, and they will be considered in the order in which counsel for plaintiff has presented them.

Was McGinley so drunk when he signed the deed in controversy that he was not in his right mind, or capable of transacting any business, or entering into any contract? He was engaged, under the ægis of the law and the seal of this court, in selling whisky to the miners of the Tanana for four bits

a drink, and more regularly in taking his own medicine and playing dice with customers for a consideration. Who shall guide the court in determining how drunk he was at 3 o'clock in the morning, when the transaction opened? Tupper or the defendant? How much credence must the court give to the testimony of one drunken man who testifies that another was also drunk? Is the court bound by the admission of the plaintiff that he was so paralized by his own whisky that he cannot remember the events of nearly 24 hours in which he seems to have generally followed his usual calling? Upon what fact in this evidence can the court plant the scales of justice that they may not stagger?

Probably the most satisfactory determination of the matter may be made by coming at once to that point of time where the deed in question was prepared, signed, and acknowledged. Did the plaintiff exhibit intelligence at that time? He refused to acknowledge a deed which conveyed a half interest, and caused his creditor to procure one to be made by the officer which conveyed only a quarter interest; he protected his property to that extent. Upon a presentation of the deed prepared by the officer, he refused to sign it until the words "and other valuable consideration" were striken out; thus leaving the deed to rest on a stated consideration of "one dollar." Upon procuring the paper to read as he desired, he signed it in a public office, before several persons, and acknowledged it to be his act and deed.

Defendant says that the deed was given to pay a gambling debt lost by the plaintiff at his own game, and his counsel argues that for this reason equity will not examine into the consideration, and grant relief, but will leave both parties to the rules of their game, and not intermingle these with the rules of law. He argues that they stand in pari delicto, and that, being engaged in a violation of the law, equity ought not to assist the proprietor of the game to recover his bank roll.

It may be incidently mentioned here, as it has been suggested to the court, that the phrase pari delicto does not mean a "delectable pair," and its use is not intended to reflect upon or characterize plaintiff and defendant.

Bion A. Dodge, for plaintiff.
Claypool & Cowles, for defendant.

WICKERSHAM, District Judge.   The plaintiff prays judgment that the transfer made to the defendant, Cleary, be vacated as fraudulent and void (1) because he was intoxicated at the time it was made, signed, and delivered, and (2) because no consideration was paid therefor.   Equity will grant relief where the transfer of a valuable property has been fraudulently extorted, for a grossly inadequate consideration, from a person in such a state of intoxication as not to be in his right mind, or capable of transacting any business or entering into any contract.   Thackrah v. Haas, 119 U. S. 499, 7 Sup. Ct. 311, 30 L. Ed. 486.

The evidence in this case raises the single question, will a court of equity set aside a deed made by the keeper of a saloon in payment of a gambling debt contracted by him to one of his customers when no other fraud is shown?   By the common law no right of action exists to recover back money which has been paid upon a gambling debt.   8 Am. & Eng. Ency. of Law (1st Ed.) 1021.   In Brown v. Thompson, 14 Bush (Ky.) 538, 29 Am. Rep. 416, the court held that the keeper of a faro bank, who sued to recover losses against one who had won by betting against the bank, was not within the spirit of the Kentucky statute, although his claim was within the letter, and accordingly refused to maintain his action. The general policy of the courts in suits to recover gambling losses is clearly stated by Judge Ross in Gridley v. Dorn, 57 Cal. 78, 40 Am. Rep. 110, where he says:

"The impropriety of the court's entertaining such actions as this is well illustrated by the circumstances of the present case, for it appears from the record to have been conceded in the court below that the right of the plaintiff to recover depended upon the question whether the wager made was a 'by bet' or a 'time bet.' To determine this question several witnesses were introduced, who gave their opinion in the matter, and we have been cited by counsel to the 'Spirit of the Times' and the 'Rules of the National Trotting Association' as authorities upon the proposition. These are, we believe, standard authorities in turf matters, but cases which depend upon them have no place in the courts. If, notwithstanding the evil tendency of betting on races, parties will engage in it, they must rely upon the honor and good faith of their adversaries, and not look to the courts for relief in the event of its breach."

There are cases where courts will assist in the recovery of money or property lost at gambling, but this is not one of them. The plaintiff was the proprietor of the saloon and the operator of the dice game in which he lost his property. He now asks a court of equity to assist him in recovering it, and this raises the question, may a gambler who runs a game and loses the bank roll come into a court of equity and recover it? He conducted the game in violation of law, conveyed his premises to pay the winner's score, and now demands that the court assist him to regain it. Equity will not become a gambler's insurance company, to stand by while the gamester secures the winnings of the drunken, unsuspecting, or weak-minded in violation of the law, ready to stretch forth its arm to recapture his losses when another as unscrupulous or more lucky than he wins his money or property. Nor will the court in this case aid the defendant.

The cause will be dismissed; each party to pay the costs incurred by him, and judgment accordingly.